*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
March 14, 2024

Plaintiff-Appellee,

v

No. 361106
St. Clair Circuit Court
LC No. 21-001046-FH

JASON RONALD ZABORSKI,

Defendant-Appellant.

Before: O'BRIEN, P.J., and BORRELLO and HOOD, JJ.

PER CURIAM.

Defendant appeals as of right his jury-trial convictions of assault by strangulation, MCL 750.84(1)(b), and domestic violence, MCL 750.81(2).[1] Defendant was sentenced, as a fourth-offense habitual offender, MCL 769.12, to 25 to 45 years' imprisonment for the assault by strangulation conviction and 93 days in jail for the domestic violence conviction. We affirm.

## I. BACKGROUND

This case arises from defendant's assault of his girlfriend, Angela Hohmann, on March 10, 2021, at their home in Fort Gratiot Township, Michigan. At the time of the assault, Hohmann was still married to Daniel Nitschke, but they were separated and in the process of getting divorced. Defendant had been living with Hohmann since December 2020. Hohmann testified that, on March 10, 2021, defendant, who was heavily intoxicated, grabbed Hohmann's hoodie, yanked her to the ground, got on top of her, and choked her throat with both of his hands. The choking ended only when Hohmann's dog bit defendant in the back. Defendant put the dog in the laundry room and then held a knife to Hohmann's throat. Defendant also punched Hohmann in the left ear at one point. Defendant eventually passed out from intoxication, at which point Hohmann left the house with her dog, met up with Nitschke, and called 911. St. Clair County Sheriff's Deputy Chad

---

[1] Defendant was also charged with assault with a dangerous weapon (felonious assault), MCL 750.82, and unlawful imprisonment, MCL 750.349b, but the jury found him not guilty of those offenses.

Cronkright responded and saw red marks on Hohmann's neck and left ear. Deputy Cronkright arrested defendant in the home after finding him passed out on the floor. Defendant had bloodshot eyes and smelled of alcohol. He was shirtless and had a scratch or cut on his back.

After defendant was convicted and sentenced, along with filing this appeal, he filed post-conviction motions in the trial court. In one motion, he claimed that he was entitled to a new trial because his trial counsel provided ineffective assistance in multiple ways. In another motion, defendant contended that his sentence was invalid because his 25-year mandatory minimum sentence was unconstitutionally cruel or unusual punishment. The trial court denied both motions.

## II. DEFENDANT'S PRINCIPAL BRIEF ON APPEAL

On appeal, defendant raises the same arguments that he did in his post-conviction motions before the trial court. First, defendant largely rehashes his allegations from his motion for a new trial that he was denied the effective assistance of counsel on multiple grounds. Second, defendant argues that his 25-year mandatory minimum sentence was unconstitutionally cruel or unusual punishment. We conclude that none of defendant's arguments warrant appellate relief.

### A. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant's ineffective-assistance claims are preserved because defendant raised them in his motion for new trial below. See *People v Heft*, 299 Mich App 69, 80; 829 NW2d 266 (2012). But defendant alternatively argues that, if his claims of ineffective assistance do not merit a new trial, then he is still entitled to relief because the substantive argument underlying each ineffective-assistance claim warrants independent relief. Defendant concedes that these alternative arguments are unpreserved because they were not properly raised below.[2]

Whether a defendant was denied the effective assistance of counsel presents a mixed question of fact and constitutional law. *Id*. Findings of fact are reviewed for clear error, while questions of law are reviewed de novo. *Id*. Because no *Ginther*[3] hearing was held, this Court's review is based on the existing record. *People v Abcumby-Blair*, 335 Mich App 210, 227; 966 NW2d 437 (2020).

With respect to defendant's unpreserved alternative arguments, this Court's review is for plain error affecting substantial rights. *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999); *People v Bennett*, 290 Mich App 465, 475-476; 802 NW2d 627 (2010). Under the plain-error standard, a defendant must show that an error occurred, that the error was clear or obvious, and that the error caused prejudice, meaning that the error affected the outcome of the lower court proceedings. *Carines*, 460 Mich at 763. Even if these requirements are satisfied, reversal is proper

---

[2] As will be explained in due course, defendant's alternative arguments are also waived because they are not included in defendant's statement of questions presented. This opinion nevertheless addresses the arguments, despite the fact that they are technically waived.

[3] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

only if the defendant is actually innocent or the error seriously affected the fairness, integrity, or public reputation of the judicial proceedings. *Id*. at 763-764.

"To prove that his defense counsel was not effective, the defendant must show that (1) defense counsel's performance fell below an objective standard of reasonableness and (2) there is a reasonable probability that counsel's deficient performance prejudiced the defendant." *People v Lane*, 308 Mich App 38, 68; 862 NW2d 446 (2014). "Effective assistance of counsel is presumed, and the defendant bears a heavy burden of proving otherwise." *People v Head*, 323 Mich App 526, 539; 917 NW2d 752 (2018) (quotation marks, brackets, and citation omitted).

To establish that defense counsel's performance fell below an objective standard of reasonableness, the "defendant must overcome the strong presumption that counsel's performance was born from a sound trial strategy." *People v Trakhtenberg*, 493 Mich 38, 52; 826 NW2d 136 (2012). To establish prejudice, a defendant must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *People v Randolph*, 502 Mich 1, 9; 917 NW2d 249 (2018) (quotation marks and citation omitted). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. (quotation marks and citation omitted). For both prongs, the defendant bears "the burden of establishing the factual predicate" of his claims. *People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999).

## 1. JURY SELECTION

Defendant first argues that defense counsel was ineffective for failing to strike or challenge for cause three jurors who were allegedly biased or expressed doubts regarding defendant's presumption of innocence. Defendant's argument lacks merit.

We will begin by summarizing or quoting relevant portions of the jurors' responses to questioning by defense counsel during jury selection. The parties both refer to the three jurors at issue as Juror #1, Juror #3, and Juror #6, and because it makes no difference to the resolution of the issue, we will likewise refer to the three jurors at issue as Juror #1, Juror #3, and Juror #6.

During jury selection, defense counsel explained that the prosecutor had the burden to prove each charge beyond a reasonable doubt and that the defense did not have to prove anything. Defense counsel asked Juror #1 if he had "any issues with" that concept, and Juror #1 responded, "No." Defense counsel asked Juror #1 if he had "any problem with the idea that [defendant] as he sits here right now is presumed to be innocent," and Juror #1 responded, "Innocent until proven." Defense counsel then asked, "And do you think that he might be guilty of something or a little bit guilty because he's on trial?" Juror #1 answered, "I don't know yet." Defense counsel continued, "You don't know if he's guilty, but do you think that just the fact that he's being put on trial means he must have done something," to which Juror #1 responded: "Correct. Yes." Defense counsel followed up, "You feel that it does?" Juror #1 answered, "Yeah, I mean we're here because of that." Later, after questioning other jurors, defense counsel returned to Juror #1 and asked:

> *Mr. Kelley* [defense counsel]: And [Juror #1]?
>
> *Juror One*: Yes, sir.

*Mr. Kelley*: And that, you know, some people who are charged with crimes are guilty, correct?

*Juror One*: Yes.

*Mr. Kelley*: And sometimes they're not.

*Juror One*: Yeah.

Juror #1 later agreed that, if defendant decided not to testify at trial, Juror #1 would not hold defendant's silence against him or think that defendant was trying to hide something.

Defense counsel had the following exchange with Juror # 3:

*Mr. Kelley*: . . . [W]hat are you [sic] thoughts on, on, do you think that [defendant] must have done something because he's on trial? And, and [Juror #3], what do you think about it? Do you think he must of [sic] done something or he wouldn't be here on trial?

*Juror Three*: I'm thinking that's why we're here.

*Mr. Kelley*: Okay. So, if, if it turned out you believe the allegations were false, do you think that occasionally innocent people are put on trial?

*Juror Three*: Possibly.

*Mr. Kelley*: Okay.

So you believe something must of [sic] happened, but not necessarily what he's charged with? Okay.

*Juror Three*: That's a yes.

Later, defense counsel asked Juror #3, "If you were to hear conflicting pieces of evidence, perhaps a 911 call, testimony, how would you try to decipher, you know, if you had different versions of what happened?" Juror #3 responded, "I'm really not sure, you just have to listen to both sides, I guess." Juror #3 affirmed that she would decide the case on the basis of the evidence. Juror #3 also indicated that she would question the credibility of a witness who changed his or her story:

*Mr. Kelley*: And I guess I'll move on. [Juror #3], how would you feel regarding somebody's testimony. What things would you look for in that witness to evaluate whether they're being truthful?

*Juror Three*: If their story changes that would be questionable.

*Mr. Kelley*: And fair to say sometimes memory might affect a story as time passes?

-4-

*Juror Three*: Yes, possibly.

*Mr. Kelley*: And sometimes, you know, sometimes the person might be intentionally changing their story to lie, and sometimes it just might be an accident. And how would you try to evaluate that in deciding that?

*Juror Three*: You would have to listen closely to see if they change.

Defense counsel engaged in the following exchange with Juror #6:

*Mr. Kelley*: Okay. Thank you.

[Juror #6], same question, do you think that [defendant] must be guilty because he's on trial?

*Juror Six*: I mean I kind of go both ways. I guess innocent until proven guilty, but we are here for a reason kind of thing.

*Mr. Kelley*: Do you have a problem with the idea that you're going to start with the presumption that he's innocent, listen to all the evidence and then make your decision at the end?

*Juror Six*: Not really, no.

*Mr. Kelley*: Okay. Thank you. . . .

Later, defense counsel asked Juror #6, "And [Juror #6], do you think you would hold it against [defendant] if he didn't, if he didn't testify?" Juror # 6 answered, "No."

Defendant argues that these responses from Juror #1, Juror #3, and Juror #6 should have led defense counsel to strike the jurors because their responses demonstrated bias against defendant or doubts about the presumption of innocence. We disagree.

A criminal defendant is generally entitled to five peremptory challenges. MCR 6.412(E)(1). But a defendant is not limited to using peremptory challenges to remove prospective jurors; a prospective juror can also be removed for cause as "set forth in MCR 2.511(D) or for any other reason recognized by law." MCR 6.412(D)(1). A prospective juror can be challenged for cause on a number of grounds, including that the prospective juror:

(2) is biased for or against a party or attorney;

(3) shows a state of mind that will prevent the person from rendering a just verdict, or has formed a positive opinion on the facts of the case or on what the outcome should be; [or]

(4) has opinions or conscientious scruples that would improperly influence the person's verdict . . . . [MCR 2.511(D).[4]]

A criminal defendant has a constitutionally-protected right to be tried by an impartial jury. *People v Miller*, 482 Mich 540, 547; 759 NW2d 850 (2008), citing US Const, Am VI and Const 1963, art 1, § 20. If a party challenges a prospective juror for cause and the juror "comes within one of the categories enumerated in the court rule, then the trial court is without discretion to retain that juror, who must be excused for cause." *People v Walker*, 162 Mich App 60, 64; 412 NW2d 244 (1987). "Otherwise, the decision to excuse for cause is within the discretion of the trial court." *Id*. See also MCR 6.412(D)(2) ("If, after the examination of any juror, the court finds that a ground for challenging a juror for cause is present, the court on its own initiative should, or on motion of either party must, excuse the juror from the panel."). Jurors are presumed to be impartial, and the defendant bears the burden of establishing that a "juror was not impartial or at least that the juror's impartiality is in reasonable doubt." *Miller*, 482 Mich at 550.

Deciding whether to accept or strike a juror is generally considered a matter of trial strategy. See *People v Unger*, 278 Mich App 210, 258; 749 NW2d 272 (2008); *People v Robinson*, 154 Mich App 92, 95; 397 NW2d 229 (1986); *People v Johnson*, 245 Mich App 243, 259; 631 NW2d 1 (2001) (opinion by O'CONNELL, J). "Perhaps the most important criteria in selecting a jury include a potential juror's facial expressions, body language, and manner of answering questions." *Unger*, 278 Mich App at 258. Armed with only a cold transcript, this Court is unable to observe jurors and listen to their answers, and so we have traditionally "been disinclined to find ineffective assistance of counsel on the basis of an attorney's failure to challenge a juror." *Id*. See also *Robinson*, 154 Mich App at 95 (stating that it was difficult to "imagine a case where a court would" hold that "defense counsel's failure to challenge a juror or jurors" amounted to ineffective assistance of counsel).

We conclude that defendant has not established the first prong of this ineffective-assistance claim, i.e., he has not established that his counsel's failure to strike or challenge for cause the three jurors at issue was objectively unreasonable. Defendant's argument hinges on his characterizations of the jurors' responses as suggesting that the jurors were either biased against defendant or reluctant to presume defendant's innocence. In our opinion, none of the three jurors' answers to defense counsel's questions indicated bias or a mindset that prevented the jurors from fairly deciding the case on the basis of the evidence that would be presented at trial. Although the jurors agreed to varying degrees with the notion that defendant may have been involved in some type of incident, they did not express a preconceived view that he was guilty of the charged offenses. And the jurors' answers when considered in their entirety reflected a willingness to apply the presumption of innocence and fairly consider the evidence presented at trial. We therefore cannot conclude that a challenge for cause would have succeeded for any of the three jurors, and defense counsel's failure to raise a meritless argument does not constitute ineffective assistance. See *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010).

---

[4] On January 1, 2024, amendments took effect causing this language to be located in MCR 2.511(E) rather than MCR 2.511(D). The amendments did not alter the relevant language.

We similarly cannot conclude that defense counsel's failure to use his one remaining peremptory challenge on any of the three jurors was objectively unreasonable. As with any issue surrounding jury selection, defense counsel was in a far better position than this Court to evaluate the jurors' facial expressions, body language, and manner of answering questions. *Unger*, 278 Mich App at 258. And, as this Court has explained, " '[a] lawyer's hunches, based on his observations, may be as valid as any method of choosing a jury.' " *Unger*, 278 Mich App at 258, quoting *Robinson*, 154 Mich App at 95. Having already rejected defendant's characterization of the jurors' responses as suggesting bias against defendant or a reluctance to presume defendant innocent, there is simply nothing in the record to suggest that defense counsel would have believed anything other than "that he had attained a reasonable, fair, and honest jury." *Unger*, 278 Mich App at 258. Moreover, defense counsel used four of his five peremptory challenges, and it would have been reasonable trial strategy if defense counsel deemed it prudent to not use a peremptory challenge on any of the at-issue jurors so as to keep one peremptory strike in reserve for a potentially less favorable prospective juror. Similarly, it would have been reasonable trial strategy if defense counsel deemed it prudent to not use his last peremptory challenge on any of the at-issue jurors out of fear that the juror who replaced the struck juror would be less favorable to the defense. Accordingly, we cannot conclude that defense counsel's performance fell below an objective standard of reasonableness. See *People v Haynes*, 338 Mich App 392, 429-430; 980 NW2d 66 (2021) ("If this Court can conceive of a legitimate strategic reason for trial counsel's act or omission, this Court cannot conclude that the act or omission fell below an objective standard of reasonableness.").

Defendant argues in the alternative that the trial court plainly erred by failing to sua sponte strike the three jurors for cause. While defendant waived appellate review of this issue by failing to include it in his statement of questions presented, *People v Fonville*, 291 Mich App 363, 383; 804 NW2d 878 (2011), he would not be entitled to appellate relief even the issue had not been waived. For the reasons explained, the record does not establish grounds to remove the three jurors at issue for cause. Hence, the trial court did not clearly or obviously err by failing to remove any of the three jurors.

## 2. OTHER-ACTS EVIDENCE

Defendant next argues that defense counsel was ineffective for failing to object to the prosecutor's notice of intent to introduce other-acts evidence and for failing to object to the admission of other-acts evidence that was not included in the prosecutor's notice. We disagree.

On August 11, 2021, the prosecution filed a notice of intent to introduce other-acts evidence under MRE 404(b) or prior acts of domestic violence under MCL 768.27b. The notice referred to statements made by Hohmann during the 911 call she made on the date of the incident in this case; a recording of the 911 call was provided to the defense. In the recording, Hohmann referred to another case pending against defendant for conduct similar to that in this case. According to the prosecution's notice, Hohmann stated in the unredacted 911 recording that defendant "has a court hearing on Friday, actually a trial for assault and battery less than murder because he keeps choking me and crap from Macomb." This statement was redacted from the version of the 911 recording that was admitted at trial, but the redacted version included a statement by Hohmann that "every time he drinks he likes to beat on me." Defense counsel stated at trial that he had no objection to the admission into evidence of the redacted 911 recording.

-7-

Hohmann's trial testimony also included brief allusions to defendant's pattern of assaulting her, and defense counsel did not object to this testimony. When testifying on direct examination about calling the police following the incident in this case, Hohmann testified about her conflicted feelings, stating that she "did" and "didn't" want to call the police. When asked to explain why she did not want to call the police, Hohmann responded: "Because I knew it would be over between me and [defendant], but I did because I knew I had to. Because if I didn't then it would, it was just getting worse like—[.]" Later in her direct examination, Hohmann was asked how she felt when defendant held the knife up to her throat during the incident in this case, and she responded, "I thought that was it, I thought I was done because my dog wasn't there to help like he always was." On redirect examination, Hohmann testified that defendant was "heavily intoxicated" during the incident in this case and that his intoxication affected his behavior. When asked to explain how defendant's intoxication affected his behavior, Hohmann responded, "Every time he drank he would put his hands on me."

The parties seemingly agree that whether Hohmann's contested statements were admissible depends on whether they satisfied the requirements of MCL 768.27b. That statute provides in relevant part:

> (1) Except as provided in subsection (4) [which is inapplicable here], in a criminal action in which the defendant is accused of an offense involving domestic violence or sexual assault, evidence of the defendant's commission of other acts of domestic violence or sexual assault is admissible for any purpose for which it is relevant, if it is not otherwise excluded under Michigan rule of evidence 403.

> (2) If the prosecuting attorney intends to offer evidence under this section, the prosecuting attorney shall disclose the evidence, including the statements of witnesses or a summary of the substance of any testimony that is expected to be offered, to the defendant not less than 15 days before the scheduled date of trial or at a later time as allowed by the court for good cause shown.

> * * *

> (6) As used in this section

> (a) "Domestic violence" or "offense involving domestic violence" means an occurrence of 1 or more of the following acts by a person that is not an act of self-defense:

> (*i*) Causing or attempting to cause physical or mental harm to a family or household member.

> (*ii*) Placing a family or household member in fear of physical or mental harm.

> (*iii*) Causing or attempting to cause a family or household member to engage in involuntary sexual activity by force, threat of force, or duress.

(*iv*) Engaging in activity toward a family or household member that would cause a reasonable person to feel terrorized, frightened, intimidated, threatened, harassed, or molested.

(b) "Family or household member" means any of the following:

\* \* \*

(*ii*) An individual with whom the person resides or has resided.

\* \* \*

(*iv*) An individual with whom the person has or has had a dating relationship. As used in this subparagraph, "dating relationship" means frequent, intimate associations primarily characterized by the expectation of affectional involvement. This term does not include a casual relationship or an ordinary fraternization between 2 individuals in a business or social context. [MCL 768.27b.]

MCL 768.27b "thus in certain instances expands the admissibility of domestic-violence other-acts evidence beyond the scope permitted by MRE 404(b)(1) . . . ." *People v Mack*, 493 Mich 1, 2; 825 NW2d 541 (2012). "Under MRE 404(b), the prosecution may not present evidence of a defendant's other crimes, wrongs, or acts in order to show a defendant's propensity to commit a crime." *People v Railer*, 288 Mich App 213, 219; 792 NW2d 776 (2010). "Notwithstanding this prohibition, however, in cases of domestic violence, MCL 768.27b permits evidence of prior domestic violence in order to show a defendant's character or propensity to commit the same act." *Id*. at 219-220. Evidence of other acts "of domestic violence can be admitted at trial because a full and complete picture of a defendant's history tends to shed light on the likelihood that a given crime was committed." *People v Cameron*, 291 Mich App 599, 610; 806 NW2d 371 (2011) (cleaned up).

On appeal, defendant argues that his trial counsel was ineffective for not objecting to Hohmann's testimony in which she alluded to other acts of domestic violence perpetrated by defendant. The failure to make an objection is strongly presumed to constitute sound trial strategy. *People v Johnson*, 315 Mich App 163, 190; 889 NW2d 513 (2016). This is because declining to raise objections often *is* strategic; for example, a defendant's attorney may reasonably deem it prudent to avoid drawing the jury's attention to certain comments or unfavorable evidence. *Unger*, 278 Mich App at 242; *People v Rice*, 235 Mich App 429, 444-445; 597 NW2d 843 (1999). When considering a claim of ineffective assistance of counsel, this Court must be careful to avoid substituting its judgment for that of defense counsel on matters of trial strategy or assessing defense counsel's strategy with the benefit of hindsight. *Unger*, 278 Mich App at 242-243.

We conclude that defense counsel's failure to object to the other-acts evidence was not objectively unreasonable because (1) an objection would have been futile and (2) not objecting to the other-acts evidence constituted reasonable trial strategy under the circumstances.

The other-acts evidence consisted of brief allusions to domestic violence committed by defendant against Hohmann, and it suggested that defendant had a pattern of engaging in assaultive behavior against Hohmann when he was intoxicated. Such evidence was admissible to show defendant's character or propensity to commit the acts of domestic violence charged in this case, MCL 768.27b(1); *Railer*, 288 Mich App at 219-220, as the evidence tended to shed light on the likelihood that defendant committed the charged acts of domestic violence, *Cameron*, 291 Mich App at 610. Additionally, Hohmann's testimony that the situation was "getting worse" explained why she called the police after the assaults at issue in this case, which in turn undermined the defense theory that Hohmann called the police at the direction of her allegedly controlling husband, Nitschke.

Defendant argues that defense counsel should have sought exclusion of the other-acts evidence under MRE 403, which permits the trial court to exclude evidence if its probative value is substantially outweighed by the danger that the evidence will unfairly prejudice the defendant. As this Court has explained, MRE 403 is not concerned with whether evidence will be prejudicial because "[a]ny relevant evidence will intrinsically be prejudicial to some extent." *People v Spaulding*, 332 Mich App 638, 650; 957 NW2d 843 (2020). MRE 403 is instead concerned with whether evidence will be *unfairly* prejudicial, and " 'unfair' prejudice exists when extraneous circumstances like shock, jury bias, sympathy, or anger pose a risk that the jury will give the evidence weight disproportionate to its rational, probative value." *Id*. Here, the other-acts evidence had probative value for the reasons explained, and the record affords no basis to find unfair prejudice, let alone unfair prejudice that substantially outweighed the probative value of the evidence.

To the extent that defendant argues that defense counsel should have objected to the other-acts evidence on the basis that defendant did not receive adequate notice of that evidence, we first observe that Hohmann's testimony on redirect examination that defendant put his hands on her when he drank alcohol was essentially the same statement she made on the redacted 911 recording, of which the defense had proper notice. Still, to the extent some of Hohmann's references to prior acts of domestic violence were not included in the prosecutor's notice and thus were not disclosed within the time period required by MCL 768.27b(2), defense counsel may have reasonably declined to object because of the fleeting nature of those allusions to other acts of domestic violence. See *Unger*, 278 Mich App at 242; *Rice*, 235 Mich App at 444-445. Additionally, Hohmann's references at trial to other acts of domestic violence were largely unresponsive, i.e., the prosecutor did not directly elicit the testimony. "[U]nresponsive answers may work a certain amount of mischief with the jury, but they are generally not considered prejudicial errors unless egregious or not amenable to a curative instruction." *People v Mahone*, 294 Mich App 208, 213; 816 NW2d 436 (2011) (quotation marks and citations omitted). In light of these considerations, we conclude that it was reasonable for defense counsel to decline to object to the other-acts evidence.

Defendant has also failed to show a reasonable probability of a different outcome but for defense counsel's failure to object to the other-acts evidence. Again, the references to the other acts of domestic violence were brief. The central focus of the trial was on the assaults underlying the charges in this case. Further, the trial court provided a proper limiting instruction regarding

the other-acts evidence.[5]  "Jurors are presumed to follow their instructions, and jury instructions are presumed to cure most errors." *People v Zitka*, 335 Mich App 324, 348; 966 NW2d 786 (2020) (quotation marks and citation omitted).  The jury's acquittal of defendant on two of the four charges reinforces the conclusion that defendant was not prejudiced by his counsel's allegedly deficient performance.  Overall, defendant's ineffective-assistance claim regarding the other-acts evidence is unavailing.

Defendant argues in the alternative that the trial court plainly erred by admitting the other-acts evidence. While defendant waived appellate review of this issue by failing to include it in his statement of questions presented, *People v Fonville*, 291 Mich App 363, 383; 804 NW2d 878 (2011), he would not be entitled to appellate relief even the issue had not been waived.  In accordance with the preceding analysis, the trial court did not clearly or obviously err by admitting the other-acts evidence.  Nor can defendant demonstrate that any error was outcome-determinative, given the brief nature of the references to defendant's prior acts of domestic violence, the trial court's proper limiting instruction, and the jury's acquittal of defendant on two of the four charges.

### 3. FAILURE TO SUBPOENA WITNESS

Defendant next argues that his trial counsel was ineffective for failing to effectuate timely service of a subpoena on Sean Brooks, the only defense witness, which prevented defendant from presenting Brooks' testimony at trial.  We disagree.

Defense counsel said at trial that he had planned to call Brooks as the only defense witness and that a subpoena had been served on Brooks at 6:25 p.m. on January 31, 2022, which was the day before trial, but Brooks had failed to appear.  Defense counsel noted that even though Brooks had been on the defense witness list for months and had been interviewed by a defense investigator months ago, the defense was unable to serve him until the day before trial.  Defense counsel asked the trial court to enter an order to show cause with respect to the failure of Brooks to appear, explaining that "we made several attempts to serve him and he was not served until 6:25 p.m." on the day before trial.  In response, the trial court quoted MCR 2.506(C)(1), which provides:

> The signer of a subpoena must issue it for service on the witness sufficiently in advance of the trial or hearing to give the witness reasonable notice of the date and time the witness is to appear.  Unless the court orders otherwise, the subpoena must be served at least 2 days before the appearance or 14 days before the appearance when documents are requested.

After quoting this provision, the trial court stated that a subpoena must be served at least two days before the witness is to testify at trial.  Defense counsel stated that he understood the court's position, but reiterated that "we did our best to get him served.  We didn't get him served until yesterday."  The trial court denied defense counsel's request, explaining that it could not subject

---

[5] In particular, the trial court instructed the jury, in relevant part: "You must not convict the Defendant here solely because you think he is guilty of other bad conduct.  The evidence must convince you beyond a reasonable doubt that the Defendant committed the alleged crime, or you must find him not guilty."

Brooks "to a show cause hearing as service was not perfected in accordance with the Michigan Court Rules."

Defendant attached to his motion for a new trial a report authored by the defense investigator, Herbert C. Welser, Jr., stating that he talked to Brooks by telephone on October 4, 2021. The report includes a purported "transcript" of Welser's interview of Brooks, although defendant has not provided an affidavit of either Welser or Brooks. During the supposed interview, Brooks, who was a friend of both Hohmann and defendant, indicated that he was a guest in Hohmann's home on the date of the incident but that he had left before the incident occurred and did not know what happened. Defendant only drank about one shot of alcohol while Brooks was there. Brooks stated that he saw Hohmann again on the day after the incident and that he did not see any marks on her body. Brooks asserted that he had seen Hohmann get angry and smack defendant on one earlier occasion but not on the date of the incident. Brooks had never seen defendant hit Hohmann. At the request of defense counsel, Welser called Brooks again in an attempt to obtain a written statement from Brooks. In an October 11, 2021 telephone conversation, Brooks stated that he did not wish to be involved any further in the case and that he did not wish to meet with Welser or provide a written statement.

In responding to defendant's motion for a new trial, the prosecution provided a copy of the subpoena that the defense had served on Brooks. The subpoena reflects that it was issued on January 24, 2022, and was served on Brooks at 6:25 p.m. on January 31, 2022, which was the day before trial.

Defendant has failed to establish that defense counsel's performance was constitutionally deficient with respect to the attempt to serve the subpoena on Brooks. The subpoena was issued just over a week before trial, and the defense made several attempts to serve the subpoena on Brooks. It is a reasonable inference that Brooks was an uncooperative witness who was actively avoiding service of the subpoena, given his expressed desire not to be involved in the case, his refusal to meet with the defense investigator or provide a written statement, and the multiple attempts to serve him. In these circumstances, the fact that service was effectuated on the evening before trial fails to demonstrate that defense counsel's performance was objectively unreasonable.

Nor has defendant shown a reasonable probability of a different outcome but for defense counsel's failure to effectuate timely service of the subpoena. Absent a showing that a witness would have testified favorably to the defense, a defendant cannot establish a reasonable probability of a different outcome but for defense counsel's failure to call the witness. *Haynes*, 338 Mich App at 430. Hence, a defendant cannot establish an ineffective-assistance claim regarding the failure to subpoena a witness when the defendant fails to provide an affidavit or other offer of proof to establish what the witness might have stated if the witness had been called to testify. *Id*. Defendant has not provided an affidavit of Brooks or the defense investigator. Moreover, even if we assume that the defense investigator's report constitutes an adequate offer of proof, Brooks' alleged statements to the defense investigator reflect that Brooks was not present during the incident and did not know what happened. While Brooks said he did not see any marks on Hohmann's body when he saw her the day after the incident, this would have been cumulative of Deputy Cronkright's testimony that, although he saw red marks on Hohmann when he first met with her on the day of the incident, the marks had diminished by the time he took photographs of her later that day. And the jury was shown the photographs that Deputy Cronkright took of Hohmann,

which were taken closer in time to when the assault occurred than when Brooks saw Hohmann the next day. The jurors were thus able to assess for themselves the extent to which Hohmann appeared injured, so any testimony from Brooks about this fact was cumulative to—and frankly less probative than—other evidence presented to the jury about this fact. Overall, no basis exists to conclude that Brooks' testimony would have made a different outcome reasonably probable.

## 4. PROSECUTOR'S CLOSING ARGUMENT

Defendant next argues that his trial counsel was ineffective for failing to object to a portion of the prosecutor's closing argument about the "domestic violence cycle." We conclude that defendant is not entitled to appellate relief for this claim.

During closing arguments, the prosecutor referred to "the domestic violence cycle." He stated that such a cycle involved four parts: the "tension or build up," the "incident" or "abuse," "reconciliation or forgiveness," and finally "the calm before the tension starts rising again." The prosecutor noted that the abuser will often apologize to the victim and that there will be a "calm before the storm starts rising again, and then the explosion again." The prosecutor asked the jury, "What part of the D.V. cycle do you think [Hohmann] was in on the stand [at trial]?" The prosecutor then discussed evidence, including the contents of recorded telephone calls between defendant and Hohmann during the pendency of this case, and the prosecutor argued that defendant was manipulating Hohmann.

"A prosecutor may not make a factual statement to the jury that is not supported by the evidence, but he or she is free to argue the evidence and all reasonable inferences arising from it as they relate to his or her theory of the case." *People v Dobek*, 274 Mich App 58, 66; 732 NW2d 546 (2007) (citations omitted). "The prosecution has wide latitude in arguing the facts and reasonable inferences, and need not confine argument to the blandest possible terms." *Id*. "The prosecutor also may comment on his own witnesses' credibility during closing argument, especially when there is conflicting evidence and the question of the defendant's guilt depends on which witnesses the jury believes." *People v Isrow*, 339 Mich App 522, 529-530; 984 NW2d 528 (2021) (quotation marks and citation omitted). "Furthermore, declining to raise objections, especially during closing arguments, can often be consistent with sound trial strategy." *Unger*, 278 Mich App at 242.

It is a close call whether the prosecutor's references to the "domestic violence cycle" during closing argument were proper. On the one hand, it is typically experts who testify about patterns or cycles of domestic violence, see, e.g., *Spaulding*, 332 Mich App at 646-649 (summarizing such testimony by an expert), and no such expert testimony was admitted in this case. On the other hand, the prosecutor did not suggest that he was an expert in such matters or that any such expert had analyzed this case, but instead offered a common-sense explanation of defendant's relationship with Hohmann that was grounded in the evidence and reasonable inferences therefrom. There was evidence that Hohmann continued her relationship with defendant after he had abused her. In particular, there was evidence that defendant and Hohmann, in violation of a no-contact order, spoke by telephone more than 200 times during the pendency of this case, including on the date of the preliminary examination, and recordings of some of those calls were admitted into evidence and played for the jury at trial. The jury heard in those calls that defendant made promises to Hohmann about their future together. From this evidence, it was reasonable to infer that defendant

was manipulating Hohmann to alter her testimony to minimize or conceal his abuse of her. This led to the prosecutor's domestic-violence-cycle argument, which the prosecution used as a means to counter the defense attacks on Hohmann's credibility related to the fact that her testimony at trial differed in some respects from what she testified to at the preliminary examination.

It is unnecessary, however, to resolve (1) whether the prosecutor's reference to the "domestic violence cycle" was objectionable and (2) if so, whether it was objectively unreasonable for defense counsel to not object. Assuming without deciding that the prosecutor's closing argument was indeed objectionable and that it was unreasonable for defense counsel to not object, defendant's argument does not warrant relief because defendant is unable to establish the prejudice prong. The trial court instructed the jury that the lawyers' statements and arguments were not evidence and that the jury must decide the case solely on the basis of the evidence admitted at trial. "Jurors are presumed to follow their instructions, and jury instructions are presumed to cure most errors." *Zitka*, 335 Mich App at 348 (quotation marks and citation omitted). Given that the prosecutor's reference to the domestic violence cycle was relatively brief (lasting less than a page of transcript in a lengthy closing argument), that the trial court instructed jurors to decide the case based solely on the evidence admitted at trial, and that jurors are presumed to follow their instructions, we conclude that defendant has failed to demonstrate a reasonable probability of a different outcome but for defense counsel's failure to object to the prosecutor's closing argument.

Defendant argues in the alternative that he is entitled to relief under the plain-error standard due to the alleged prosecutorial misconduct. But defendant has waived appellate review of this issue because he failed to include it in his statement of questions presented. *Fonville*, 291 Mich App at 383. Further, defendant cannot establish entitlement to relief under the plain-error standard. As explained, it is a close question whether the prosecutor's remarks were improper, so any error cannot be considered clear or obvious. But even if the error was obvious, defendant cannot demonstrate that the error was outcome-determinative given the trial court's instruction that the lawyers' arguments and statements were not evidence, which is presumed sufficient to cure most errors. *Zitka*, 335 Mich App at 348.

## 5. CUMULATIVE ERROR

Defendant cursorily asserts that the cumulative effect of defense counsel's errors requires a new trial. We disagree.

"The cumulative effect of several errors can constitute sufficient prejudice to warrant reversal even when any one of the errors alone would not merit reversal, but the cumulative effect of the errors must undermine the confidence in the reliability of the verdict before a new trial is granted." *Dobek*, 274 Mich App at 106. "Absent the establishment of errors, there can be no cumulative effect of errors meriting reversal." *Id*. The only potential error identified by defendant was his counsel's failure to object to the prosecutor's closing argument, and defendant is not entitled to relief on this ineffective-assistance claim for the reasons explained. Accordingly, there is no cumulative prejudicial effect to consider.

Defendant suggests at various points in his appellate brief that a remand for an evidentiary hearing may be appropriate. However, defendant has failed to establish that an evidentiary hearing is warranted because resolution of defendant's ineffective-assistance claims does not require

further factual development.  See *People v Chapo*, 283 Mich App 360, 369; 770 NW2d 68 (2009) (holding that an evidentiary hearing was unnecessary because this Court was "not persuaded that defendant has demonstrated any issue for which further factual development would advance his claim").

B.  CONSTITUTIONALITY OF SENTENCE

Defendant next argues that his 25-year mandatory minimum sentence under MCL 769.12(1)(a)[6] is unconstitutionally cruel or unusual punishment as applied to him.  We disagree.

Constitutional issues are reviewed de novo.  *People v Burkett*, 337 Mich App 631, 635; 976 NW2d 864 (2021).

"The Michigan Constitution prohibits cruel *or* unusual punishment, Const 1963, art 1, § 16, whereas the United States Constitution prohibits cruel *and* unusual punishment, US Const, Am VIII."  *Burkett*, 337 Mich App at 636 (quotation marks and citation omitted).  "If a punishment passes muster under the state constitution, then it necessarily passes muster under the federal constitution."  *Id*. (quotation marks and citation omitted).  A three-part test is applied to determine whether a punishment is cruel or unusual: "(1) the severity of the sentence imposed and the gravity of the offense, (2) a comparison of the penalty to penalties for other crimes under Michigan law, and (3) a comparison between Michigan's penalty and penalties imposed for the same offense in other states."  *Id*. at 636-637 (quotation marks and citation omitted).

"Legislatively mandated sentences are presumptively proportional and presumptively valid."  *Id*. at 637 (quotation marks and citation omitted).  In order to overcome that presumption, "a defendant must present unusual circumstances that would render the presumptively proportionate sentence disproportionate."  *Id*. (quotation marks and citation omitted).  Further, "[s]tatutes are presumed to be constitutional, and the courts have a duty to construe a statute as constitutional unless its unconstitutionality is clearly apparent."  *Id*. (quotation marks and citation omitted).  Generally, "habitual-offender statutes are constitutional and the sentences under them

---

[6] MCL 769.12(1)(a) provides, in relevant part:

(1) If a person has been convicted of any combination of 3 or more felonies or attempts to commit felonies, whether the convictions occurred in this state or would have been for felonies or attempts to commit felonies in this state if obtained in this state, and that person commits a subsequent felony within this state, the person shall be punished upon conviction of the subsequent felony and sentencing under section 13 of this chapter as follows:

(a) If the subsequent felony is a serious crime or a conspiracy to commit a serious crime, and 1 or more of the prior felony convictions are listed prior felonies, the court shall sentence the person to imprisonment for not less than 25 years. . . .

are not cruel or unusual, because the state has a right to protect itself from individuals who continue to engage in criminal activities." *Id*. (quotation marks and citation omitted).

A facial constitutional challenge "involves a claim that a legislative enactment is unconstitutional on its face, in that there is no set of circumstances under which the enactment is constitutionally valid." *Id*. at 637-638 (quotation marks and citation omitted). An as-applied constitutional challenge by contrast "alleges a present infringement or denial of a specific right, or of a particular injury in process of actual execution of government action." *Id*. at 638 (quotation marks and citation omitted). "An as-applied constitutional challenge is based upon the particular facts surrounding [the] defendant's conviction and sentence." *People v Adamowicz (On Second Remand)*, ___ Mich App ___, ___ n 10; ___ NW2d ___ (2023) (Docket No. 330612); slip op at 9 n 10.

In *Burkett*, 337 Mich App at 638-642, this Court rejected a facial constitutional challenge to the requirement of MCL 769.12(1)(a) to impose a 25-year mandatory minimum sentence. Applying the three-part test used to determine whether a sentence is cruel or unusual punishment, this Court held that "the minimum sentence mandated by MCL 769.12(1)(a) is neither cruel nor unusual." *Burkett*, 337 Mich App at 642.

In light of the holding in *Burkett*, a facial challenge to MCL 769.12(1)(a) cannot succeed. But defendant characterizes his argument on appeal as an as-applied challenge. Because defendant's 25-year minimum sentence is legislatively mandated, it is presumptively proportional and presumptively valid, and defendant has the burden of establishing the existence of unusual circumstances that would render the presumptively proportionate sentence disproportionate. *Burkett*, 337 Mich App 637.

Defendant has failed to satisfy his burden and overcome the presumption of proportionality because he has not presented unusual circumstances that would overcome the presumption of proportionality. His 25-year mandatory minimum sentence is not unduly harsh given the egregious facts of this case. In short, defendant violently assaulted his then-girlfriend, Hohmann, including by grabbing her hoodie, yanking her down to the ground, getting on top of her, and choking her throat with both of his hands. Hohmann testified that defendant was squeezing her throat "[r]eally hard," that she could not breathe, and that it felt like the choking lasted "forever." The choking ended only when Hohmann's dog bit defendant's back. Defendant also punched Hohmann in the ear. The jury found defendant guilty of assault by strangulation as well as domestic violence. These convictions were not isolated incidents; defendant had five prior felony convictions, nine prior misdemeanor convictions, and two subsequent misdemeanor convictions. He had also twice been returned to prison as a parole violator and had received prison sentences as a result of revocation of probation.

Defendant notes that his guidelines range was 19 to 76 months, but we note that the guidelines range is only advisory. *People v Lockridge*, 498 Mich 358, 391-392; 870 NW2d 502 (2015). At any rate, as discussed earlier, defendant was convicted of a violent assault, which was the latest in a long line of convictions. Given the seriousness of the instant offense and defendant's criminal history, we are not persuaded that defendant's advisory guidelines sentence establishes that the sentence imposed is disproportionate, especially because "the state has a right to protect

itself from individuals who continue to engage in criminal activities." *Burkett*, 337 Mich App at 637 (quotation marks and citation omitted).

Defendant says that his crimes were "deeply personal and isolated to" Hohmann, and that his "criminal history does not show him to be a danger to society" because his crimes were "isolated to one individual." But defendant has a long and violent criminal history that was not limited to his assaults on Hohmann. His criminal history includes: convictions in 2004 for attempted first-degree home invasion and assault and battery; a conviction in 2005 for aggravated stalking; a conviction in 2006 for third-degree criminal sexual conduct; a conviction in 2010 for resisting or obstructing a police officer; and convictions in 2019 for attempted resisting or obstructing a police officer, and assault and battery. When he committed the instant offenses, defendant was on bond for another charge of assault with intent to do great bodily harm and was under three terms of probation. Contrary to defendant's argument, his criminal history shows he was a danger not only to Hohmann but to the community.

In sum, defendant was a violent criminal offender. He has failed to present unusual circumstances that would overcome the presumptive proportionality of his legislatively mandated minimum sentence. His sentence was not unconstitutionally cruel or unusual punishment.

## III. DEFENDANT'S STANDARD 4 BRIEF

In a Standard 4 brief,[7] defendant argues that the prosecutor committed misconduct by knowingly using perjured testimony. We disagree.

"In order to preserve an issue of prosecutorial misconduct, a defendant must contemporaneously object and request a curative instruction." *Bennett*, 290 Mich App at 475. Defendant did not contemporaneously object on the basis of the alleged prosecutorial misconduct. Therefore, the issue is unpreserved.

Unpreserved claims of prosecutorial misconduct "are reviewed for plain error affecting substantial rights." *Id*. Under the plain-error standard, a defendant must show that an error occurred, that it was clear or obvious, and that it caused prejudice, i.e., that the error affected the outcome of the lower court proceedings. *Carines*, 460 Mich at 763. Reversal is proper only if the defendant is actually innocent or the error seriously affected the fairness, integrity, or public reputation of the judicial proceedings. *Id*. at 763-764; *Bennett*, 290 Mich App at 475-476.

"Given that a prosecutor's role and responsibility is to seek justice and not merely convict, the test for prosecutorial misconduct is whether a defendant was denied a fair and impartial trial." *Dobek*, 274 Mich App at 63. "It is well settled that a conviction obtained through the knowing use of perjured testimony offends a defendant's due process protections guaranteed under the Fourteenth Amendment." *People v Loew*, 340 Mich App 100, 126; 985 NW2d 255 (2022), lv gtd 510 Mich 952 (2022) (quotation marks and citation omitted). "The focus of this inquiry looks to whether the testimony affected the outcome of the trial and not to the blameworthiness of the prosecutor." *Id*. (quotation marks and citation omitted). "Perjury has been defined as a willfully

---

[7] See Administrative Order No. 2004-6, 471 Mich c, cii (2004).

false statement regarding any matter or thing, if an oath is authorized or required." *Id*. at 128 (quotation marks and citation omitted). "[T]o prove prosecutorial misconduct on the basis of perjury, a defendant must show two things—first, that a witness knowingly made a false statement, and second, that the prosecutor knowingly elicited the false statement." *Id*.

The mere existence of contradictory statements or testimony by a witness does not establish that the prosecutor knowingly elicited false testimony. See *People v Parker*, 230 Mich App 677, 690; 584 NW2d 753 (1998). In other words, an inconsistent prior statement "is not definitive evidence that the [witness's] trial testimony is false." *People v Bass*, 317 Mich App 241, 275; 893 NW2d 140 (2016). It is for the jury to decide whether to believe a witness's trial testimony. *Unger*, 278 Mich App at 222. "[A] jury is free to believe or disbelieve, in whole or in part, any of the evidence presented," *People v Perry*, 460 Mich 55, 63; 594 NW2d 477 (1999), which includes determining the credibility of witnesses that appear before it, see *Cameron*, 291 Mich App at 616.

Defendant points to various inconsistencies between Hohmann's trial testimony and her preliminary-examination testimony, including her testimony with respect to the level of defendant's alcohol consumption during the incident and whether she remembered defendant choking her. Defendant also relies on Hohmann's preliminary-examination testimony to suggest that Hohmann was told by her now-former husband, Nitschke, what to write in her statement to the police.

But the record affords no basis to conclude that the prosecutor knowingly elicited false testimony. Although there were inconsistencies between Hohmann's trial testimony and her preliminary-examination testimony, this does not prove that Hohmann committed perjury at trial and that the prosecutor knew that she did so. At trial, Hohmann testified in detail regarding the events that occurred on the date that defendant assaulted her. The inconsistencies between her trial testimony and her preliminary-examination testimony were fully explored in front of the jury during the prosecutor's direct examination of her and the defense's cross-examination of her.

Hohmann's direct-examination testimony at trial indicated that the inconsistencies between her preliminary-examination testimony and her trial testimony were attributable to the fact that defendant manipulated her into lying for him at the preliminary examination. Hohmann testified that, despite the issuance of a no-contact order barring defendant from contacting Hohmann, defendant called her on multiple occasions, including on the date of the preliminary examination. Hohmann continued talking to defendant during this time period because, as she explained at trial, she still loved him and still wanted to be in a relationship with him. Hohmann acknowledged at trial that she testified "a little bit differently" at the preliminary examination than she did at trial. For example, she admitted that she provided inaccurate testimony at the preliminary examination about the level of defendant's alcohol consumption. Hohmann also said at trial that she provided inaccurate testimony at the preliminary examination about whether she remembered being choked by defendant; she admitted at trial that, at the preliminary examination, she said that she did not remember being choked by defendant, but said that her preliminary-examination testimony on this point was inaccurate. Additionally, Hohmann admitted at trial that when she was confronted with her written statement to the police at the preliminary examination, Hohmann said that everything she wrote in that statement with respect to defendant's assaults on her was accurate.

Hohmann further testified at trial that she had multiple phone conversations with defendant before the preliminary examination, including on the morning of the preliminary examination, and that they talked about how Hohmann would testify. Before trial, the prosecutor played for Hohmann recordings of some of her telephone conversations with defendant, including from the date of the preliminary examination and from October 28, 2021, before another court hearing. At the time of the preliminary examination, Hohmann was hoping that the charges would be dismissed because she still wanted to be in a relationship with defendant. During the October 28, 2021 phone conversation, defendant was making promises to Hohmann about what they would do together, including taking their respective children camping, starting a business, and having a life together. When asked at trial how that made her feel, Hohmann testified: "I loved [defendant]. I wanted, I wanted to be with him. I still love him."

Hohmann testified at trial that, when she called the police to report defendant's assaults, Nitschke told her that she had to do it, but Hohmann knew that she had to as well. Hohmann resented Nitschke for telling her that she had to call the police. Hohmann "thought [Nitschke] just wanted [defendant] out of the picture. So if [Nitschke's] girlfriend kicked him out he would have [Hohmann] to fall back on." When asked if she sees it differently now, Hohmann responded, "I still see it that way because that's just how [Nitschke] is." However, Hohmann also said that she now realizes that defendant, not Nitschke, is the reason for what happened.

During cross-examination by the defense counsel at trial, Hohmann testified that she knew that Nitschke "wasn't a big fan of" defendant. Hohmann agreed that Nitschke's voice can be heard in the 911 recording telling Hohmann what to say when she reported defendant's assaults. Hohmann testified that Nitschke "always" tells Hohmann what to say, and he is very controlling. Hohmann did not want to call the police and felt pressured by Nitschke to do so, but she knew she had to do so. Hohmann again testified that she believed that Nitschke wanted defendant out of the picture.

On redirect examination, Hohmann testified that she and Nitschke have a 15-year-old child together. Hohmann acknowledged that it was not good for her to be around a person like defendant who was using drugs, including crack cocaine, with her. Hohmann thus recognized by the time of trial that the situation with Nitschke was not as simple as him wanting to get defendant out of the way.

Hohmann further explained on redirect examination at trial that, during the preliminary examination, she sometimes testified differently depending on whether she was being questioned by defense counsel or the prosecutor. Although she testified in response to questioning by defense counsel at the preliminary examination that she did not recall feeling any discomfort around her neck, she testified at another point of the preliminary examination that defendant placed his hands around her throat and that she was not able to breathe. She felt conflicted at the preliminary examination because of her conversations with defendant. Audio recordings of the phone conversations between defendant and Hohmann on June 8, 2021, which was the date of the preliminary examination, were admitted into evidence and played for the jury. After recordings from the morning of June 8, 2021, were played, Hohmann agreed with the prosecutor that her intention was to go along with what defendant said and to testify in a manner described in the recordings, i.e., to say that she was "sleep walking or sleep talking" and that she did not remember what happened, but in fact she really did remember what happened. And she said that the

preliminary examination did not work out the way that she and defendant had planned because she ended up telling part of what happened, consistent with how she testified at trial.

Another recorded phone conversation from June 8, 2021, after the preliminary examination, was then played for the jury. In that conversation, defendant cut Hohmann off anytime she would start to talk about anything that may have happened during the underlying incident. When Hohmann said in the phone call that she was telling the arresting officer on the steps of the courthouse that she was crying because she was going to lie, defendant cut her off and said he did not have time for that. Hohmann had over 200 phone conversations with defendant from the start of this case until October 2021 or November 2021, and all of those conversations were recorded by the authorities. The final recording played for the jury was from the evening of October 28, 2021. That conversation had made Hohmann feel excited about having a life with defendant.

On recross-examination, Hohmann acknowledged that she had changed her story multiple times and had lied under oath. When asked if she wanted the jury to believe everything that she had testified about at trial, Hohmann responded, "I don't even care, I just want this over with." Hohmann also clarified that it was her, not defendant, who referred to "sleep talking" during one of the recorded phone conversations. Hohmann said that she accepted over 200 calls from defendant because she loved him, but she was also scared and terrified of him. As of the time of trial, she had not been in touch with defendant for a few months.

Nitschke testified that he was present when Hohmann spoke to the police to report the incident. Nitschke talked to the deputies while Hohmann wrote her statement in her car. Nitschke testified that he did not tell Hohmann what to say to the deputies or what to write in her statement. If there was a male voice in the 911 call, it could have been his voice; he could not recall if he was with Hohmann when she called 911.

In sum, the record affords no basis to conclude that the prosecutor knowingly elicited perjury. The inconsistencies in Hohmann's testimony about which defendant complains on appeal were fully explored in front of the jury at trial. It was for the jury to assess Hohmann's credibility, *Cameron*, 291 Mich App at 616, and to decide whether to believe her trial testimony, *Perry*, 460 Mich at 63; *Unger*, 278 Mich App at 222. Hohmann's trial testimony indicated that it was defendant himself who encouraged false testimony on the part of Hohmann at the preliminary examination. There is no basis to conclude that the prosecutor knowingly elicited false testimony.

Defendant next argues that there was insufficient evidence to support his convictions. We disagree.

A defendant's argument regarding the sufficiency of the evidence is reviewed de novo. *People v Kanaan*, 278 Mich App 594, 618; 751 NW2d 57 (2008). "When reviewing a defendant's challenge to the sufficiency of the evidence, [this Court] review[s] the evidence in a light most favorable to the prosecutor to determine whether any trier of fact could find the essential elements of the crime were proven beyond a reasonable doubt." *People v Williams*, 294 Mich App 461, 471; 811 NW2d 88 (2011) (quotation marks and citation omitted). Direct evidence of guilt is not required. *Id*. "Rather, circumstantial evidence and reasonable inferences arising from that evidence can constitute satisfactory proof of the elements of a crime." *Id*. (quotation marks,

brackets, and citation omitted). "This Court will not interfere with the trier of fact's role of determining the weight of the evidence or the credibility of witnesses." *Kanaan*, 278 Mich App at 619. "All conflicts in the evidence must be resolved in favor of the prosecution." *Id*.

This Court has explained the elements of assault by strangulation as follows:

MCL 750.84(1)(b) criminalizes "[a]ssault[ing] another person by strangulation or suffocation." An "assault is either an attempt to commit a battery or an unlawful act that places another in reasonable apprehension of receiving an immediate battery." *People v Terry*, 217 Mich App 660, 662; 553 NW2d 23 (1996). And a "battery is the consummation of an assault." *Id*. Additionally, MCL 750.84(2) defines "strangulation or suffocation" as "intentionally impeding normal breathing or circulation of the blood by applying pressure on the throat or neck or by blocking the nose or mouth of another person." [*People v Lydic*, 335 Mich App 486, 498 n 9; 967 NW2d 847 (2021) (alterations in original).]

The elements of domestic violence as charged in this case were that defendant committed an assault or an assault and battery against Hohmann and that defendant either had a dating relationship with Hohmann or was a resident or former resident of the same household as Hohmann. MCL 750.81(2); *Cameron*, 291 Mich App at 614. Also, "it is well settled that identity is an element of every offense." *People v Yost*, 278 Mich App 341, 356; 749 NW2d 753 (2008).

Hohmann testified that she and defendant were dating and living together on the date of the incident, March 10, 2021. Hohmann further testified that, on that date, defendant grabbed her by her hoodie, yanked her down to the ground, got on top of her, choked her throat with both of his hands, and punched her in the ear. While defendant was choking Hohmann, he was squeezing "[r]eally hard," and Hohmann could not breathe. She testified that it felt like the choking lasted "forever." The choking ended when Hohmann's dog bit defendant's back. Later that day, defendant, who was intoxicated from alcohol, passed out on the bedroom floor. Hohmann left the house, met up with Nitschke, and called 911.

Nitschke testified that, when he met up with Hohmann that day, he noticed "a few marks" on Hohmann's neck and that her hair was disheveled and "a mess." Deputy Cronkright, who was dispatched to meet with Hohmann after she called 911, testified that he noticed that Hohmann had "some redness on her left neck and her ear, left ear." Deputy Cronkright then went to Hohmann's house and found defendant passed out on the bedroom floor. Defendant smelled of alcohol, had difficulty waking up, was disoriented, and had bloodshot eyes. Defendant was shirtless and had a scratch or cut on his back, where Hohmann had said that her dog had attacked him. Police photographs showing defendant's bloodshot eyes and the injury to his back were admitted into evidence.

After defendant was arrested and taken to jail, Deputy Cronkright went back to collect Hohmann's written statement and to take photographs of her. Deputy Cronkright testified that, by this point, some time had passed, and "[t]he redness had subsided a little bit. It wasn't nearly as prevalent on her." That is, by the time a photograph was taken of her neck area, "there really wasn't much [redness] there." The same was true with respect to the red mark on her left ear. The

-21-

photographs of Hohmann thus did not show what Deputy Cronkright had seen earlier when he initially met up with Hohmann that day.

This evidence was sufficient to support both of defendant's convictions. Hohmann's testimony indicated that defendant assaulted and strangled her. Defendant and Hohmann were in a dating relationship and were living together at the time of the assaults. Defendant argues that Hohmann was lying at trial and that Nitschke had told her what to say when she reported the incident to the police. However, it was the jury's prerogative to decide whether to believe Hohmann's trial testimony, and this Court will not interfere with the jury's assessment of a witness's credibility. *Unger*, 278 Mich App at 222. Moreover, Hohmann's testimony was corroborated to some extent by the testimony of Nitschke and Deputy Cronkright, who saw marks on Hohmann's body consistent with her description of defendant's assaults on her. And Deputy Cronkright found defendant passed out and intoxicated on the bedroom floor with a scratch or cut on his back, all of which was consistent with Hohmann's account of what had occurred. Accordingly, defendant's argument challenging the sufficiency of the evidence is devoid of merit.

Lastly, defendant argues that the prosecutor suppressed material evidence that was favorable to the defense in violation of *Brady v Maryland*, 373 US 83, 87; 83 S Ct 1194; 10 L Ed 2d 215 (1963). We disagree.

In order to preserve a claim that a *Brady* violation occurred, a defendant must move in the trial court for a new trial or relief from judgment on that ground. *People v Burger*, 331 Mich App 504, 516; 953 NW2d 424 (2020). While defendant filed in the trial court a motion for a new trial or relief from judgment, he did not raise a *Brady* claim in either motion. Therefore, this issue is not preserved for appellate review.

Generally, "this Court reviews due process claims, such as allegations of a *Brady* violation, de novo." *People v Dimambro*, 318 Mich App 204, 212; 897 NW2d 233 (2016) (quotation marks, brackets, and citation omitted). However, because defendant did not preserve this issue, this Court's review is for plain error affecting substantial rights. *Burger*, 331 Mich App at 516. "To establish plain error, the defendant must establish that (1) an error occurred, (2) the error was plain—i.e., clear or obvious, and (3) the error affected substantial rights—i.e., the outcome of the lower court proceedings was affected." *Id*. (quotation marks and citation omitted). "Reversal is warranted only when plain error resulted in the conviction of an actually innocent defendant or seriously affected the fairness, integrity, or public reputation of judicial proceedings." *Id*. (quotation marks and citation omitted).

In *Brady*, 373 US at 87, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." In order to establish a *Brady* violation, a defendant must demonstrate that: "(1) the prosecution has suppressed evidence; (2) that is favorable to the accused; and (3) that is material." *People v Chenault*, 495 Mich 142, 150; 845 NW2d 731 (2014). "The government is held responsible for evidence within its control, even evidence unknown to the prosecution, without regard to the prosecution's good or bad faith." *Id*. (citations omitted). "Evidence is favorable to the defense when it is either exculpatory or impeaching." *Id*. (citations omitted).

To establish materiality, a defendant must show that there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. This standard does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal. The question is whether, in the absence of the suppressed evidence, the defendant received a fair trial, understood as a trial resulting in a verdict worthy of confidence. In assessing the materiality of the evidence, courts are to consider the suppressed evidence collectively, rather than piecemeal. [*Id.* at 150-151 (quotation marks, ellipsis, and citations omitted).]

Defendant argues that the prosecution refused to provide all of the jail phone recordings of defendant's conversations with Hohmann. Defendant also seems to suggest that the prosecution did not provide the entire recording of Hohmann's 911 call. Defendant asserts that the jury would have found him not guilty if it had heard all of the recordings. Defendant says that he could have used the recordings to impeach Hohmann and Nitschke. Defendant asserts that the recordings would have shown that Hohmann did not want to go to court or bring the police into the situation and that Nitschke was the one who made the 911 call.

Initially, defendant's appellate presentation on this issue is deficient. He fails to provide any citations of the lower court record to support his assertions. As the appellant, defendant has the burden to identify a factual basis in the lower court record for his appellate arguments. *People v Elston*, 462 Mich 751, 762; 614 NW2d 595 (2000); see also MCR 7.212(C)(7) ("Facts stated must be supported by specific page references to the transcript, the pleadings, or other document or paper filed with the trial court."). "Defendant may not leave it to this Court to search for a factual basis to sustain or reject his position." *People v Traylor*, 245 Mich App 460, 464; 628 NW2d 120 (2001) (quotation marks and citation omitted). Therefore, given defendant's failure to support his argument with appropriate citations of the record, this Court need not consider his argument. *People v Petri*, 279 Mich App 407, 413; 760 NW2d 882 (2008).

In any event, defendant's *Brady* claim is baseless because the record does not support defendant's contention that the prosecution suppressed material evidence that was favorable to the defense.

The record contains no support for defendant's suggestion that some part of the 911 recording was suppressed. The prosecutor referred to the 911 recording in a pretrial notice of intent to introduce other-acts evidence and stated that the 911 recording was being provided to the defense at that time. A redacted version of the 911 recording was admitted as an exhibit at trial and played for the jury. Before the admission of the 911 recording into evidence, the redaction was discussed outside the presence of the jury. Defense counsel stated that he had discussed the redaction with the prosecutor and did not have any objection. There is no indication in the record that the prosecution suppressed any portion of the 911 recording.

Nor is there any support in the record for defendant's contention that the prosecution suppressed any of the recorded jail phone conversations. During a November 8, 2021 pretrial hearing, the prosecutor disclosed the discovery of these recorded jail phone conversations:

[T]he People will note that the People discovered as part of its preparation for trial over 200 plus phone contacts between the Defendant and the victim in this case. The People have contacted the Sheriff's Department, specifically Detective Kelsey Wade who is following up with the witness interference investigation. Additionally, she, she placed the victim's phone numbers on the protected list at the jail to prohibit those calls from being able to go out. And any further bond violation or contact violation notice the People will file subsequent to this date.

The trial court asked defense counsel if he had anything to say, and defense counsel responded, "Your Honor, I am not going to comment on those issues."

As discussed earlier, some of the jail phone recordings were admitted at trial and played for the jury. During a discussion outside the presence of the jury, the prosecutor noted that redactions had been made to the recordings to remove references to the jail and that the redacted recordings would be played for defense counsel during a break before they were played for the jury, and defense counsel stated that he had no objection to this. Later, after the jury left the courtroom to begin deliberations, defense counsel stated:

> Your Honor, [defendant] is asking to make a record that the 911 call that was admitted as an exhibit he's indicated that his first attorney, Andrea Lacey and myself did not ever review with him before this trial. I can't speak to what Ms. Lacey did or didn't do earlier in this case, but he wanted to make a record of that. Regarding the jail calls, I believe I did review those with him. He believes that he may not have heard them all. I believe we did listen to them, but he wanted a record made of that.

At sentencing, defense counsel stated that defendant wanted all of the recorded jail phone conversations to be preserved pending his appeal. Defense counsel explained that defendant

> wanted that to be made part of the record here at sentencing. That some of those were provided to me in the discovery process and many of which were not. So, he's making that request, your Honor. I think he's going to make that himself when he has a chance to speak.

Later at sentencing, defendant said that he would like for all of the recorded jail phone conversations to be preserved. The trial court stated that it was willing to sign an order to preserve those recordings pending appeal. Defendant said that he had spoken "with the Sergeant at the jail and he said right now that [the recorded] phone calls are still there, they are going to be preserved up until my release." On the day after sentencing, the trial court entered an order requiring the St. Clair County Sheriff's Office to preserve the recorded jail phone calls for appellate purposes.

In sum, the prosecutor disclosed the existence of the more-than-200 jail phone recordings. The record does not indicate that the prosecutor refused to provide any recordings upon request.

Defendant has also failed to establish any basis to conclude that any recordings that were not provided were material or favorable to the defense. Defendant says he would have used the recordings to impeach Hohmann and Nitschke, but defendant offers little explanation of how the

recordings could have been used to impeach either witness. Defendant asserts that Hohmann admitted that she did not want to go to court or bring the police into the situation. Defendant suggests that Nitschke was controlling Hohmann. However, Hohmann testified at trial regarding her reluctance to report defendant's abuse and regarding her view that Nitschke was controlling. Hohmann admitted to accepting more than 200 calls from defendant during the pendency of this case and that she still loved him and wanted to be in a relationship with him. Hohmann also testified at trial that Nitschke was very controlling and could be heard on the 911 recording telling her what to say. Hohmann admitted that she felt pressured by Nitschke to call the police and that she believed Nitschke wanted defendant out of the picture. Therefore, these points were developed at trial without any additional recordings that defendant claims would have been used for impeachment purposes. Defendant fails to show that there was a reasonable probability of a different outcome if any additional recordings had been provided.

Affirmed.

/s/ Colleen A. O'Brien
/s/ Stephen L. Borrello
/s/ Noah P. Hood